**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ALVIN PONSON, JR.                 *

Plaintiff                          *

v                                    *         Civil Action No. ELH-12-1683

CORRECTIONAL MEDICAL SERVICES, et al.  *

Defendants                  *
                                      ***

**MEMORANDUM**

Plaintiff Alvin Ponson, Jr., who is self-represented, is incarcerated at the Maryland Correctional Institution-Jessup (MCIJ).  He filed suit against a host of defendants, pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to his medical needs and improper medical care, amounting to cruel and inhuman punishment, in violation of the Eighth Amendment to the United States Constitution.  ECF 1, 6.  In general, plaintiff alleges, *inter alia*, that he was not properly diagnosed; that medical care for a pilonidal cyst was unreasonably delayed, causing extreme and unnecessary pain; that after surgery, he was discharged prematurely from the hospital, while still under the effects of improper and/or improperly administered anesthesia, and without adequate pain medication; and that his sutures were not removed in a timely manner. ECF 1.  Plaintiff seeks both compensatory and punitive damages.[1]

The defendants are Correctional Medical Services ("CMS"), now known as Corizon; Corizon Medical Services ("Corizon"), formerly CMS; Bon Secours Baltimore Health Systems; Wexford Health Services, Inc.; Barbara Childs-Steele, R.N.; Emma Lynott, R.N.; Meleku Ayalew, M.D.; Zymunt Bogucki, P.A.; Jean Midy, M.D.; Samuel Ross, M.D.; Kwangbay Lee, M.D.; Lum Maximuangu, RNP; Sikiru Salami, R.N.; and Rosline Alia, R.N.  They have filed

---

[1] The Complaint, about twenty pages in length, is quite detailed and well written.

four separate motions to dismiss or for summary judgment, supported by exhibits.  *See* ECF 20, 24, 35, and 42.  Plaintiff opposes each motion.  *See* ECF 23, 27, 40, and 46.  In addition, plaintiff has moved for examination of medical records (ECF 28) and for leave to file an amended complaint.  ECF 44.

No hearing in necessary to resolve any of the motions.  *See* Local Rule 105.6.  For the reasons that follow, defendants' motions, construed as motions for summary judgment, shall be granted, and plaintiff's motions shall be denied.

### Factual Background

Ponson states he brought his health problem to the attention of prison medical staff in May 2010, when he was seen by Zymunt Bogucki, P.A., in response to a sick call request "concerning a bump that was the diameter of a dime" that was discharging bloody pus.  ECF 1 at 5.[2]  Ponson claims that Bogucki told him, "It's nothing but just a bump!"  *Id*. at 8.  Two courses of antibiotics and application of heat through hot showers were prescribed for the problem over a period of three to four months.  But, the "boil" resurfaced.  *Id*. at 5.  Plaintiff was then seen by Melaku Ayalew, M.D., who told him the problem was "nothing," although he did nothing more than look at the cyst, according to plaintiff.  *Id*. at 8.  Ponson claims that Dr. Ayalew refused to refer plaintiff to a specialist stating, that he would "just give [him] more antibiotics," although plaintiff expressed his concern that the antibiotics were not working.  *Id.*

On January 11, 2011,  Ponson claims he reported to Bogucki and Ayalew that the boil reappeared a third time, that the antibiotics were not working, and that the single boil/cyst had become two boils/cysts with a horizontal welt, three to four millimeters thick, leading between the site of the boil to the inside wall of Ponson's left buttock.  *Id*. at 5, 8.  Ponson explained that

---

[2] Plaintiff did not specify the location of the bump.  The medical records indicate it was on his buttocks.

the boils would burst unexpectedly.   He also notified medical staff that he was periodically experiencing numbness and tingling in his arms, legs, and hands.  *Id.* at 8.  According to Ponson, despite the persistence of his condition, and the severe pain he was experiencing, both Bogucki and Ayalew continued the ineffective course of antibiotic treatment and refused to send him to a specialist.  *Id.*  ECF 1 at 5.  After approximately one and one-half years of ineffective treatment, Dr. Ayalew was transferred elsewhere and was replaced by Yonas Sisay, M.D.  *Id.* at 8.

Ponson recounts that he first saw Dr. Sisay on November 19, 2011, at which time Sisay told Ponson that he "had enough antibiotics" and immediately terminated them.   He also immediately ordered a consultation with a specialist.   Ponson alleges that, by this time, his condition had worsened and was causing "extreme pain" and "tremendous discomfort."  *Id.*  He explains that he had to make an effort not to put any pressure on his infected left side to avoid bursting the cyst with the "discharge of its contents."  *Id.*  Ponson describes the infection as a "pilonidal cyst with a fistulous tract and/or protuberance 3-4 mm thick," and, in addition to being horizontal, it "developed vertically...."  *Id.*  He adds that it looked like a "reversed L shape."  *Id.*

On October 18, 2011, Dr. Sisay ordered blood tests for Ponson to determine possible causes for the condition.[3]  Ponson requested the results on January 11, 2012, but was told by Sisay he would see him again on February 8, 2012, after he was seen by the surgeon.  *Id.*

Ponson complains that he had to wait for two to three months before he was seen by the surgeon, Dr. Jean Midy, who worked at Bon Secours Hospital.  *Id.* at 3, 9.  When Dr. Midy examined plaintiff in January or February 2012, Midy told him to have medical staff send him back "when it swells up again," because he "needed to know where to cut."  ECF 1 at 9.  Ponson

---

[3] There is some discrepancy in plaintiff's dates.  He alleges that he first saw Dr. Sisay on November 19, 2011, but that Dr. Sisay ordered a consultation and blood tests on October 18, 2011.  *See* ECF 1 at 9.  The discrepancy is not material.

further alleges that Midy wrote in his report "no cyst - no pathology identified," despite the fact that the infection was visible and palpable. *Id.*

Plaintiff was seen again by Sisay on February 21, 2012, and related what Midy had said. Ponson alleges that Sisay responded, "How could he have missed it!  It's right there!"  ECF 1 at 9.  Dr. Sisay ordered a second consultation on March 9, 2012, by a different provider, Dr. Oyagoa.  The consultation request written by Sisay explained Ponson's medical condition and noted the physical appearance of the infection in detail.  *Id.* at 9, 10.  In particular, Sisay noted that Ponson had "some palpable cord like feeling and a hypopigmented perianal protuberance of 3-4 mm."  *Id.* at 5.  Ponson claims that he frequently experienced humiliating episodes when the boils/cysts would burst. *Id.* at 10.

According to Ponson, he returned to the Jessup Regional Institution ("JRI") hospital on March 21, 2012, for evaluation by Dr. Oyagoa.  Ponson claims that he recognized Oyagoa as Dr. Midy, although Oyagoa insisted that he had never before seen Ponson.  ECF 1 at 10.  Ponson maintains that Oyagoa is really Dr. Midy, and that Midy engaged in a "charade" by pretending to be a different doctor. *Id.*

Ponson states that Dr. Oyagoa (or really Dr. Midy) noted lesions that were discharging and draining and diagnosed him as having an infected pilonidal cyst that needed to be excised. Ponson alleges that Oyagoa (who Ponson believes was really Midy) asked how long it had been since he was first seen by a doctor for the problem.  And, when Ponson responded September 2010, Oyagoa expressed shock that it had been missed. *Id.*

A pre-operative examination was conducted on April 12, 2012.  ECF 1 at 5, 11.  Ponson alleges that P.A. Bogucki "hastily" expedited a chest x-ray for purposes of the examination. *Id.* at 11.  On April 18, 2012, Ponson was sent to Bon Secours Hospital for surgery, along with

another inmate, Charles Allen.   Ponson and Allen were escorted by correctional officers Gatewood, Sowande, Mamlouck, and Egbuchulam.   *Id.*   Ponson alleges that Nurse Towanna attempted three times to put an intravenous (IV) line in his right forehand, but could not get the IV started until  putting it in his left hand.   Ponson claims the surgery, which was performed by Dr. Midy, began at 9:55 a.m. and was concluded at 12:41 p.m.   ECF 1 at 11.

According to Ponson, the anesthesia administered by Dr. Kwangbag Lee caused adverse effects and he did not recover full consciousness until later in the evening of April 18, 2012.   *Id.* Ponson asserts that Bon Secours wrongfully and prematurely discharged him while he was in an incoherent state.

Ponson maintains that he was given either the wrong type of anesthesia or too much of it, because he had never previously experienced difficulty with general anesthesia.   Claiming that Dr. Samuel Ross is the CEO at Bon Secours, Ponson asserts that Ross was responsible for efficient operations of the hospital and should have insured proper care for plaintiff.   In addition, Ponson states that Wexford Health Services, Inc. ("Wexford") should have allowed a longer recovery stay in the event of a mishap of the sort that occurred.   *Id.* Additionally, Ponson notes that his signature does not appear on the discharge papers, supporting his position that he was not fit for discharge.

Plaintiff explains that, in the days after his discharge, he learned from correctional officers that he was prematurely discharged from Bon Secours at 2:00 p.m., in a condition that was not suitable for discharge.   The officers told Ponson he was "totally out of it" and was constantly vomiting.   *Id.*   Ponson relates that Sowande informed him that he and other officers strongly recommended to medical staff at Bon Secours that Ponson should be admitted so that the anesthesia could be allowed to wear off, because they did not want to transport Ponson in his

condition.  Ponson claims the officers were left with no other choice but to transport him, and even had to put his clothes and shoes on for him.  Ponson adds that Gatewood told him that he (Gatewood) had to hold up Ponson's head for four to five hours because he continued to vomit. *Id*. at p. 12.

Ponson was admitted to JRI hospital by Nurse Lum Maximuangu at 5:12 p.m. on April 18, 2012.  He has no recollection of being transported to JRI.  Ponson states he learned the next day from a hospital orderly, Ralph Lucas, that he was "messed up" and that Lucas had to put Ponson in a wheelchair to transport him a short distance, because Ponson was unable to walk without assistance.  Based on this information, Ponson alleges that Nurse Lum's admission assessment, indicating Ponson showed no signs of pain or other abnormal conditions or symptoms, was inaccurate and false.  Ponson maintains that if the nurse had spoken with the transportation officers, the Nurse would have learned of his recent vomiting episodes.  ECF 1 at 13-14.

According to Ponson, at about 10 a.m. on April 19, 2012, head nurse Cheryl, P.A. Johnson, and Dr. Ayalew made their morning rounds.  He recalls that Ayalew stood four to five feet away from his bed and did not perform any physical examination.  According to Ponson, when he told Ayalew that he finally got the surgery Ayalew had denied, Ayalew was "speechless."  *Id*. at 14.  Further, Ponson claims that when he attempted to ask Ayalew a question, Ayalew told him he had already been seen.  Ponson claims that around noon that day, Ayalew and the head nurse inspected his wound during a dressing change.  Ponson alleges that Ayalew made the decision to discharge him without ever touching him with a stethoscope or other medical device, because he wanted Ponson "out of his hair."  *Id*.  Thus, Ponson maintains that Ayalew could not have known anything about his respiratory or cardiovascular systems, nor

could he have known about his gastrointestinal condition, despite representing to the contrary in medical records.  Ponson notes that he did not have a first bowel movement after surgery until April 21, 2012; therefore, Ayalew could not accurately have noted anything about his gastrointestinal condition on April 19, 2012.  *Id.*

Ponson was discharged from JRI hospital and transported back to MCIJ on April 19, 2012, at approximately 6 P.M.  Upon arrival, Ponson told the pharmacist and the duty nurse, Salami, that he had not received his antibiotics or pain medication since noon that day, and indicated that he was in "tremendous" pain.  *Id.* at 15.  Ponson was told that his record and order for medication was not yet in and that he should return for the 8 p.m. medication call.  When Ponson returned as instructed, the medications prescribed for him (Percocet, Cefaloxocin, Metronidazole, and "collace") were not available.  *Id.*  Ponson's unit officer, Smyth, called again between 9:00 p.m and 9:30 p.m. to check on the status of the medication, but it still was not available.  As a result, Ponson had no pain medication the entire night.  *Id.*  At 8:00 a.m. the following morning, Ponson explained his situation to one of the unit officers, Sergeant Davis, who called the medical unit on his behalf and advised Ponson that once the medication was received it would be sent to the nurse's station.  Further delays occurred in dispensing the medication because Tylenol-3 was substituted for Percocet and, Ponson alleges, the "medication order came in seemed not to reach 30 feet away to the pharmacy computer terminal."  *Id.*

Ponson alleges that he also experienced difficulties with having the dressing changed twice a day,[4] obtaining an order for "sit [sic] baths" three times a day, and arranging feed-in for 20 days.  Ponson asserts that he only received one dressing change on April 19, April 20, and

---

[4] Plaintiff asserts that he did not begin to receive his morning dressing changes on a regular basis until he filed three ARPs regarding the failure to provide them.  On May 17, 2012, the order was changed to require only one dressing change per day.  ECF 1 at 16.

April 21, 2012.  *Id*.  Additionally, he claims he received prescribed antibiotics and pain medication once on April 19, 2012, and did not receive medication again until April 22, 2012. *Id*.

In addition, plaintiff contends that post-surgical orders required sitz baths three times a day and after each bowel movement, but Nurse Lum and Dr. Ayalew re-wrote two orders at JRI hospital.  On April 19, 2012, Bogucki changed the order to require three showers a day and after each bowel movement, because sitz baths were not available.  Ponson claims he never received any sitz baths, despite the written orders.  ECF 1 at 16.

On May 4, 2012, Ponson filed a grievance through the administrative remedy procedure ("ARP") because he had been told on April 25, 2012, during a follow-up examination, that he should return in one week for removal of the sutures, which did not occur.  *Id*. at 15.  On the day Ponson was supposed to have his stitches removed, May 2, 2012, he reported to the medical area and asked about the appointment.  He claims he was advised by the nurse that no one had done the paperwork to have him taken to JRI hospital.  In response to his ARP, Ponson was called to the medical unit to see P.A. Bogucki, who told him he would be rescheduled for the following week to see the surgeon for suture removal.  Ponson claims that Bogucki subsequently told him that he had spoken with Dr. Midy by phone, who asked Dr. Sisay to remove the sutures on May 10, 2012.  ECF 1 at 15-16.

In the meantime, Ponson claims that, on May 5 and 6, 2012, Rosline Alia, R.N., told him she would only change the dressing for him once a day because the wound was dry and healed when she saw it on April 21, 2012, three days after Ponson's surgery.  Ponson alleges that Alia told him she could use her judgment as a nurse to determine that only one dressing change was required.  Ponson disputes Alia's assessment of the wound, insisting that there is no way it could

have been healed three days after surgery.  *Id*.  But, he admits that he was given supplies to change the dressing himself on April 28, 2012.  *Id*. at 16.

According to Ponson, Nurse Salami also repeatedly refused to change his dressing on multiple occasions in May 2012.  *Id*. at 17.  He also complains about the conduct of Ms. Steele, the Medical Administrator, who approved Nurse Salami's conduct, and the conduct of Emma Lynott, another R.N.

Ponson claims the sutures remained intact until May 10, 2012, when they were finally removed by Dr. Sisay.  ECF 1 at 15-16.  He claims that Dr. Midy stated in a report dated April 25, 2012, that he wanted the sutures to remain intact to prevent dehiscence or splitting.  *Id*. at 17. In Dr. Sisay's records, Ponson claims he noted there was "minimal dehiscence" when he removed the sutures.

On May 16, 2012, Ponson submitted a sick call slip concerning painful lumps at the incision site which discharged blood when pressed or during defecation.  *Id*.  In addition, Ponson claims he developed an infection beneath the testicles and at a new site on the right buttock. When Ponson was seen by Bogucki for his complaints, Bogucki told him the infection was possibly attributable to the surgical wound site.  *Id*.  According to plaintiff, the infection was due to improper wound care.

Ponson was seen by Dr. Midy on May 17, 2012, for a follow-up appointment, at the request of Dr. Sisay.  Ponson claims Midy noted that the incision healed unevenly; the sutures were removed after two weeks; "patient developed first degree dehiscence at upper portion of incision;" the wound was "relatively not infected;" and the groin and perineum infection were not related to the surgery.  *Id*. at 17.  Ponson disagrees with the assessment that the infection was unrelated to his surgery and claims it was due to Alia's refusal to change his wound dressing as

ordered and the institution's total failure to provide him with the prescribed sitz baths.  *Id*.

Ponson claims that, after forty days, the surgical site had not completely healed and was painful.

Plaintiff asserts he was seen by Bogucki on May 31, 2012, who allegedly acknowledged there was a stitch still in place.  But, he told Ponson it would be gone in about a week.  ECF 1 at 18.  He also renewed the order for continued dressing changes, contrary to the decision of Nurse Salami.  *Id*.

## Standard of Review

Defendants' motions are styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  See ECF 20, 24, 35, and 42.  ECF 20 was filed by Corizon, Childs-Steele, Lynott, Ayalew, Bogucki, Maximuangu, Salami, and Alia (collectively, "Corizon defendants").  ECF 24 was filed by Wexford.  A third motion, ECF 35, was filed by Dr. Midy.  And a fourth motion, ECF 42, was filed by Bon Secours Baltimore Health Systems, Dr. Ross and Dr. Lee ("Bon Secours defendants").  As noted, all of the motions are supported by exhibits.  Plaintiff's medical records (312 pages) are appended to ECF 20 as Exhibit 2.[5]

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, a motion styled in the alternative, to dismiss or for summary judgment, implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Pursuant to Rule 12(d), a court, in its discretion, may consider matters outside of the pleadings in regard to a Rule (b)(6) motion.

---

[5] In citing to the plaintiff's medical record, I have generally used the page numbers as they appear on the exhibit.  These numbers do not necessarily correspond to the ECF numbers.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67. If the court considers extrinsic material, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

A court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.*, Civ. No. JFM-10-0206, 2010 WL 2732334, at *3, 2010 U.S. Dist. LEXIS 68772, at *8-10 (D. Md. July 8, 2010). But, when a movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be

on notice that  conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.[6]

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011).   However, a "party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).   To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.   Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)).   "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).   A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created

---

[6] The motion of the Corizon defendants (ECF 20) is not *captioned* in the alternative. However, the first paragraph of the text plainly indicates that it is filed in the alternative.  And, plaintiff clearly knew the motion was filed in the alternative, because his response (ECF 23) is captioned: "Plaintiff's Response To Defendants' Motion for Summary Judgment."  *Id.*   In support of his opposition, plaintiff also submitted, under oath, a 20 page Declaration.

a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Plaintiff has not filed an affidavit under Rule 56(d). Moreover, I am satisfied that it is appropriate to address the defendants' motions as ones for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

genuine issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). In resolving the motion, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in [his] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### Discussion

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law. *See Baker v. McCollam*, 473 U.S. 137 (1979). Plaintiff claims violations of his rights under the Eighth Amendment, relating to his contention of inadequate medical care.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (*citing Wilson v. Seiter*, 501 U.S.294, 297 (1991)). In order to state an Eighth

14

Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).   Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available.  *Farmer v. Brennan*, 511 U.S. at 837.

As noted above, objectively, the medical condition at issue must be serious.  A "serious medical need" refers to a medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko*, 535 F.3d at 241 (citing *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).  Proof of an objectively serious medical condition, however, does not end the inquiry.  The second component of proof requires "subjective recklessness" in the face of the serious medical condition.  *Farmer*, 511 U.S. at 839.

Deliberate indifference to a serious medical need "describes a state of mind more blameworthy than negligence."  *Id.* at 835.  It requires proof that the prison official knew of or was aware of the inmate's need for medical attention and disregarded an excessive risk to the inmate's health or safety.  *Id*. at 837.  Put another way, for liability to attach based on a violation of the Eighth Amendment, the law "requires consciousness of a risk. . . ."  *Id.* at 840.  As the Fourth Circuit has explained: "Actual knowledge or awareness on the part of the alleged inflicter…becomes essential to proof of deliberate indifference 'because prison officials who

lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

In *Farmer,* the Supreme Court rejected an objective test for deliberate indifference. *Id.* at 837; *see Wilson v. Seiter,* 501 U.S. 294, 303 (1991). The *Farmer* Court held that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. The *Farmer* Court added that it is enough for an Eighth Amendment claimant to show that "the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).

Under § 1983, individual liability must be based on personal conduct. *See Wright v. Collins,* 766 F.2d 841, 850 (4th Cir. 1985); *see also Foote v. Spiegal*, 118 F.3d 1416, 1423 (110th Cir. 1997). And, absent subjective knowledge, a prison official is not liable. *Farmer*, 511 U.S. at 847; *see Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998).

Even if the requisite subjective knowledge is established, a prison official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Under the Eighth Amendment, "[a] prison official's duty . . . is to ensure "'reasonable safety' . . ." (citation omitted). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2001) (*citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Of import here, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones*, *supra*, 145 F. 3d at 166.  Without evidence that a doctor ignored symptoms linked to a serious medical condition of which the doctor was aware, the subjective knowledge required for Eighth Amendment liability is not present.  *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

The defendants do not suggest that Ponson's condition was not serious.  Therefore, I presume that the infected Pilonidal cyst that Ponson suffered is a serious medical condition for purposes of an Eighth Amendment analysis.  Nevertheless, inmates do not have a constitutional right to the treatment of their choice.  *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Disagreements between medical staff and an inmate as to the necessity for, or the manner or extent of, medical treatment do not rise to a constitutional injury.  *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, *supra,* 766 F.2d at 849; *see also Fleming v. LeFevere*, 423 F.Supp. 2d 1064, 1070-71 (C.D. Cal. 2006).  Thus, "[d]isagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged."  *Wright*, 766 F.2d at 849; *see Estelle*, 429 U.S. at 105-06; *Fleming*, 423 F. Supp. 2d at 1070-71; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975).

In this case, the evidence shows that the health care providers knew of plaintiff's symptoms and tried to treat them.  Although I do not minimize the plaintiff's frustration or the severity of his condition, it is impossible to find evidence of deliberate indifference on this record.

<u>Claims against the Corizon defendants</u>

The Corizon Defendants, *i.e.*, Corizon, Alia, Ayalew, Bogucki, Steele, Lynott, Maximuangu, and Salami, argue that the complaint as it pertains to their participation in Ponson's care does not state an Eighth Amendment claim.   ECF 20.   Specifically with regard to the delay in providing surgery, defendants Ayalew and Bogucki claim that each of Ponson's sick call slips submitted prior to surgery, dating from July 13, 2010 through April 8, 2012, show that he was seen promptly by a health care provider in response to his complaints.   *Id.*, Ex. 2 at 189, 191-195, 201-204, and 210-11. They point out that when it was determined that the conservative treatment provided by was of antibiotics was not effectively treating the cyst, a surgical consultation was ordered.   *Id.* at 64-65. Plaintiff was seen twice by a surgeon, and then his surgery was scheduled.   It was performed at Bon Secours Hospital in Baltimore on April 18, 2012.   *Id.* at 213-14.

In his opposition, Ponson states that Bogucki erroneously wrote in his report that the infection was located on his right buttock.   ECF 23 at 7.   Although Ponson states that improperly noting the location of a medical condition "could be and has been costly to patients," he does not explain how the error harmed him.   *Id.*   Plaintiff acknowledges that he was seen seven times between June 5, 2010 and April 12, 2012, and was prescribed antibiotics on four occasions.   *Id.* Unfortunately, the treatment was not successful.

Ponson's claim of inadequate medical care is not necessarily measured by the effectiveness of the treatment.   Plaintiff's allegation that he was not provided necessary medical treatment is belied by the content of the exhaustive medical record, which establishes that plaintiff was evaluated repeatedly and promptly in response to his complaints.   Ponson's disagreement with the course and place of his treatment, and his dissatisfaction with its outcome, does not provide the basis for a federal civil rights complaint.

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).  And, as observed earlier, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, *supra*, 766 F.2d at 849 (citing *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir. 1970)).

Ponson also complains, *inter alia*, that Ayalew never touched him physically when he supposedly examined him for his ailment.  By contrast, when he was seen by Dr. Sisay, who did a proper physical examination, a surgical consultation immediately followed.   ECF 23 at 8.  Ponson implies that the delay in receiving a surgical consultation was due in part to Ayalew's refusal to examine him.  The fact remains, however, that Ponson was prescribed antibiotics for the infection which, according to the complaint, at least temporarily relieved the symptoms Ponson was experiencing.  *See, e.g.,* ECF 1 at 5 (claiming infection had *resurfaced* after completion of antibiotic course).

Ponson also contends that the surgical consultation was delayed by one month because of an administrative failure.  ECF 23 at 8.  While the delay of one month was unfortunate, Ponson admits that once the error was realized, steps were taken to expedite his appointment.  *Id*.  The relatively brief delay in surgery is not enough to establish deliberate indifference to a serious medical need.  This is particularly so where, as here, the delay was unintentional, as evidenced by the effort to expedite the appointment once the delay was discovered.

With respect to the care Ponson received after his surgery, Dr. Ayalew alleges that the record evidence refutes Ponson's allegations that he never examined plaintiff after surgery.  ECF

20, Ex. 1 at 36-37.   Additionally, Ayalew asserts that Ponson's generalized assertions that Ayalew's main concern was to get Ponson "out of his hair," and Ponson's complaint that Ayalew had an offensive attitude, are unsupported by facts and do not support a claim of deliberate indifference.   *Id.*   Ponson states in his opposition that, in essence, Ayalew lied when he made notations in his record following surgery.   ECF 23 at 9-10.   Even assuming Ponson's allegation is correct, he has failed to show that the erroneous statements in the medical record resulted in any harm to him or were the result of an effort to deliberately deprive plaintiff of needed medical care.

Defendant Bogucki asserts that Ponson's claim against him regarding the delay in suture removal following the surgery is without merit.   He supports this assertion with a record dated May 4, 2012, wherein he noted a conversation with Dr. Midy, who advised that the sutures should stay in place until May 10, 2012.   ECF 20, Ex. 1 at 24.   Those orders were followed when Dr. Sisay removed the sutures on May 10, 2012.   *Id.* at 22.   Indeed, Ponson appears to contradict himself in the complaint by first asserting the stitches were left in too long and later claiming the sutures were supposed to stay in place to prevent splitting.   ECF 1 at 16-17.

Bogucki denies making any statement to Ponson regarding a stitch that was inadvertently not removed.   ECF 20, Ex. 1 at 9-10.   The denial, however, is based only on the medical record of the encounter with Ponson, and is not supported by an affidavit or sworn statement. Assuming the truth of Ponson's allegation that a stitch was left in place, there is no evidence that the oversight injured Ponson.   At most, the claim is one of negligence, insufficient to establish the required deliberate indifference to a serious medical need.

With respect to defendant Lum Maximuangu, Ponson claims that she did not consult with the correctional officers who transported him from the hospital and, as a result, inaccurately

recorded that he was drowsy but experiencing no vomiting when he was admitted to the prison infirmary after surgery.  Maximuangu relies upon the record created upon Ponson's admission, indicating that she took his vital signs, provided him with an inflatable donut cushion on which to sit, and generated a treatment plan.  ECF 20, Ex. 2 at 38-40.

In his opposition, Ponson asserts that he can provide witnesses who will testify that he was incoherent and vomiting four to five hours following surgery.  ECF 23 at 14.  Further, he alleges that "Maximuangu must be held responsible for inadequate diagnosis and/or recordkeeping."  *Id*.  Assuming Ponson's assertions are true, they are troubling.  But, the failure to diagnose or accurately record symptoms is insufficient to establish an Eighth Amendment claim.  *See Quinones,* 145 F. 3d at 166.

As to nurses Alia and Salami, Ponson claims that they refused to provide wound dressing changes in a timely manner, and as ordered, which resulted in a skin infection.  Further, he alleges that the record of dressing changes submitted by defendants is inaccurate.  He states that Alia, a rotating weekend nurse, insisted that Ponson was only supposed to receive dressing changes once per day.  Ponson claims she changed his dressing in the evening on April 21, 2012, but never called him back the following day, even though her initials on the log indicate the dressing change was performed.  ECF 23 at 15.  Additionally, Ponson correctly points out that the records reflect only evening dressing changes, with no notations for morning dressing changes.  *Id*.; *see also* ECF 20, Ex. 2 at 455 and 457.

Alia and Salami rely on medical records indicating that Ponson received regular bandage changes and assert that the skin infection Ponson suffered was determined by Dr. Midy to be unrelated to the surgery.  ECF 20, Ex. 2 at 455-458 and 16.  Midy indicated that Ponson had "a fungal skin infection" on his groin and perineum "which is not related to the surgery."  ECF 20,

Ex. 1 at 16.   Moreover, there is no established resulting injury from the reduced number of dressing changes.   In the same record noting the infection, Ponson's orders for dressing changes were changed to once a day.   Ponson's disagreement with the medical determination that the fungal infection was related to the lack of dressing changes twice a day is not enough to establish deliberate indifference to a serious medical need.   To the extent Alia and Salami decided, based on their medical training, that two dressing changes a day were unnecessary, they were entitled to make such a judgment without resultant Eighth Amendment liability.

Ponson also states in his opposition that the orders for his post-surgical care specified that he was to receive sitz baths and dressing changes twice a day, and defendants do not dispute this fact.   ECF 23 at 15.   Further, he claims there was never a qualification placed on the orders for dressing changes and sitz baths that they could be discontinued when the incision site healed.   *Id.* Ponson alleges that defendants Salami and Alia ignored the medical orders, took matters into their own hands, and simply decided on their own to reduce dressing changes to once a day.   *Id.* at Ex. AA-1.

Defendants do not address the failure to provide Ponson with the sitz baths prescribed. But, it appears from the record that sitz baths were not available at JCI.   For that reason, showers were recommended.   Moreover, defendants rely on the medical determination that Ponson's fungal skin infection was unrelated to the surgery.   When Ponson's fungal infection was examined, recommendations were made for its treatment, among them "adequate hygiene."   ECF 23, Ex. BB-1; ECF 20, Ex. 1 at 16.

Defendants Steele and Lynott assert that Ponson has not made any specific claim against them, other than to allege they are responsible for supervising the provision of health care services.   ECF 20 at 16.   In his opposition, Ponson states that the delays he experienced in

receiving surgery and the failure to provide him with prescribed care was due in part to Steele and Lynott failing to supervise properly members of the medical staff.  ECF 23 at 18.

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims.  *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit).  Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984)).  Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Ponson admits that he appreciated the efforts made by Steele and Lynot in response to his complaints about delays in medical care.  ECF 1 at 18.  The claim against these two defendants is based on *respondeat superior*, as there are no specific allegations of wrongdoing against them. Therefore, Steele and Lynot are entitled to summary judgment in their favor.  Additionally, Ponson's claim against Corizon is also without specific allegations of wrongdoing, and is based on *respondeat superior*, entitling Corizon to summary judgment in its favor.

<u>Claims against Wexford Health Sources, Inc.</u>

Wexford provides onsite utilization review management services for off-site medical services, hospitalizations, and other specialized medical or clinical services provided to inmates in the custody of the Maryland Department of Public Safety and Correctional Services (DPSCS). ECF 24 at 7.  Wexford states that at all times relevant to the complaint it received requests for referrals to specialists and recommendations for off-site care from Corizon and acted on those requests.  *Id*. at Ex. 1.  Wexford was not permitted to approve non-emergent off-site care or treatment in the absence of a request for it.  Additionally, Wexford states it was not the final decision maker as to what specific care or treatment an inmate would receive, because there was in place an appeal process where any decision made by Wexford could be appealed by Corizon health care providers.  *Id*.

According to Wexford, its participation in Ponson's course of care involved receiving a request for surgical evaluation for a mass in the cleft of his right buttock on June 24, 2011.  At that time, the mass had been present for over eight months and Dr. Smith, a Wexford employee, requested that Ponson be monitored and returned for follow-up if any changes were noted.  On October 20, 2011, Wexford approved a surgical consultation for Ponson after his case was re-presented.  On March 16, 2012, Wexford received another request for surgical consultation which was approved.  On April 9, 2012, Wexford received a specialty service request from Dr. Sisay and a surgery request received April 18, 2012, was approved for excision of a pilonidal cyst and excision of anal fistula.  Following that approval, Wexford sent precertification letters to Bon Secours Hospital, where Ponson's surgery was to be performed.  ECF 24, Ex. 1, 2, and 4.

In his opposition, Ponson asserts that Wexford is liable due to its contractual relationship with Corizon and Bon Secours Hospital.  ECF 27.  Ponson's theory of liability for Wexford is

one of *respondeat superior* and, as discussed above, is insufficient to support an Eighth Amendment claim.  Therefore, Wexford is entitled to summary judgment in its favor.

Claims against Dr. Midy

Ponson claims Dr. Midy failed to properly diagnose his condition during an examination in January or February of 2012, and that he prematurely discharged Ponson from Bon Secours after surgery.  The latter claim is addressed below.  Midy asserts that the failure to diagnose Ponson's condition is an insufficient basis for an Eighth Amendment claim.  ECF 35.  In his opposition, Ponson reiterates his claims and asserts new information regarding an evaluation for surgery to remove sutures on November 16, 2012.  ECF 40.  Ponson does not, however, refute that at most his claim is one of medical malpractice.

An alleged wrongful failure to diagnose generally amounts to a claim of medical malpractice.  "[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference."  *Quinones*, 145 F. 3d at 166.  As the Supreme Court said in *Estelle*, *supra*, 429 U.S. at 105, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference."  *Estelle*, *supra*, 429 U.S. at 105.  Put another way, mere negligence or medical malpractice does not rise to a constitutional level.  *Russell v. Sheffer*, *supra*, 528 F.2d at 319; *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986).  None of the claims raised against Midy indicate a deliberate indifference to a serious medical need.  Thus, Midy is entitled to summary judgment.

Claims against the Bon Secours defendants

Ponson's claims against Bon Secours, Dr. Lee, and Dr. Ross involve his contentions that either the wrong anesthesia was used or too much anesthesia was administered during his surgery, and that he was prematurely discharged from the hospital.  ECF 1 at 11-12.  Defendants

25

assert that Dr. Ross and Bon Secours did not directly render any treatment to Ponson and that they are entitled to dismissal because *respondeat superior* is not a valid theory of recovery under 42 U.S.C. §1983.  Additionally, Dr. Lee, who administered Ponson's anesthesia, asserts that the claim fails to allege deliberate indifference to a serious medical need.  ECF 42-1 at 2.

Specifically, defendants observe that Ponson was admitted to Bon Secours for surgery on April 18, 2012, and the preoperative procedure was explained to him, as indicated in the nursing note.  ECF 42, Ex. C at 7.  Ponson expressed his understanding and posed no questions.  *Id*.  Dr. Lee served as the anesthesiologist, conducted a Pre-Anesthetic Evaluation, and determined that general anesthesia was appropriate for the procedure.  *Id*. at 10.  Ponson consented to general anesthesia by signing a consent form at 9:00 a.m.  *Id*. at 11.  The anesthesia began at 9:55 a.m.; the procedure began at 10:09 a.m.; it was completed at 10:52 a.m.; and the anesthesia was terminated at 11:02 a.m.  *Id*. at 12-13.  Ponson was transferred to the Post-Anesthesia Care Unit ("PACU") following surgery.  *Id*.

During his stay in PACU Ponson's arousal level was monitored.  Shortly after his arrival at 11:12 a.m., his level was rated at two, indicating that he could occasionally sleep and arouse easily.  *Id*. at 19.  At 11:58 a.m., Ponson was described as alert and awake.  *Id*.  At 1:58 p.m., Ponson was transferred from PACU to the same day surgery recovery area, where it was observed that he was alert, oriented to person, place, and time, and was able to restate his discharge instructions.  *Id*. at 8.  When he was discharged from the hospital at 2:10 p.m., Ponson was put in a wheelchair and escorted by correctional officers.  *Id*.

Defendants claim that during the three hours following the procedure and before his discharge, Ponson was evaluated on at least eight separate occasions by at least six different providers.  Further, they claim that the same day surgery post-operative scoring assessment

system in place at Bon Secours requires the evaluation of patients three times before discharge, and they must have a score higher than 8 out of 12.  *Id*. at 15.  In Ponson's case, he was scored at 12 on all three occasions.  *Id*.

In opposition to defendants' motion, Ponson asserts that being evaluated on eight different occasions is an indication that something was not going well with his recovery from the anesthesia. ECF 46.  He admits he authorized use of general anesthesia for the procedure, but claims he researched it further to determine the proper type of anesthesia to use for cyst removal procedures.  *Id*. at 2.  Whether the proper type of anesthesia was used or too much was administered, the claim asserted sounds in medical malpractice.[7]  Cruel and unusual punishment under the Eighth Amendment does not encompass negligence or medical malpractice.  The undisputed facts regarding administration of anesthesia and Ponson's discharge from the hospital do not support such a finding.  Accordingly, Dr. Lee is entitled to summary judgment.

The claims against Bon Secours and Dr. Ross must also be dismissed, as there has been no showing that either defendant was personally involved in the claims alleged.  Ponson seeks to amend his complaint (ECF 44) in light of the motion to dismiss or for summary judgment filed by Bon Secours, Ross and Lee, seeking to include defendant Jane Doe, a nurse who discharged him from the hospital as well as John Doe, a doctor who was Dr. Lee's assistant.  ECF 44.  Although amendments are "freely" given "when justice so requires," F.R. Civ. P. 15(a)(3), this court is not obliged to permit amendment of a complaint where the amendment is a futility.  *See Katyle v. Penn Nat. Gaming, Inc*. 637 F.3d 462, 471 (4th Cir. 2011) (citing *United States ex rel.*

---

[7] Under Maryland law, a claim of medical malpractice may proceed in state or federal court only after review before the Maryland Health Claims Alternative Dispute Resolution Office.  *See* Md. Code, Cts & Jud. Proc., §3-2A-01 *et seq.*; *see also Davison v. Sinai Hospital of Balt. Inc.*, 462 F.Supp. 778, 779-81 (D. Md. 1978); *Carroll v. Konits*, 400 Md. 167, 172 (2007).  There is no demonstration that plaintiff has sought or completed such review.

*Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 376 (4th Cir.2008)).  Having concluded that the claim asserted with respect to Ponson's anesthesia and subsequent discharge from the hospital is insufficient to establish an Eighth Amendment claim, the proposed amended claims against the unknown nurse and doctor shall be denied.

## Conclusion

The undisputed facts reflected in the sizeable record establish that defendants are entitled to summary judgment, as there is no evidence that Ponson was subjected to a violation of the Eighth Amendment, based on deliberate indifference to a serious medical need.  At most, he presents claims of negligence and medical malpractice.  To the extent that plaintiff claims negligence with regard to his medical care, his allegations are not reviewable by this Court under the Eighth Amendment, because negligence is not actionable under 42 U.S.C. § 1983.  *See Davidson v. Cannon,* 474 U.S.344, 347-48 (1986); *Daniels v. Williams,* 474 U.S. 327, 333-34 (1986); *Estelle v. Gamble, supra*, 429 U.S. at 106.

Moreover, as noted, prior to bringing a medical malpractice claim, a plaintiff in Maryland must comply with the requirements of Maryland's Health Care Malpractice Claims Act.  *See* Md. Code (2006 Repl. Vol. 2012 Supp.), § 3-2A-01 of the Courts and Judicial Proceedings Article ("C.J.").  In particular, plaintiff must exhaust his medical malpractice claim before the Maryland Health Claims Alternative Dispute Resolution Office as a condition precedent to any judicial action.  *See* C.J. § 3-2A-02; *Carroll v. Konits*, 400 Md. 167, 172 (2007).  This exhaustion requirement applies to claims of medical malpractice filed in federal courts.  *See Davison v. Sinai Hospital of Baltimore, Inc.,* 462 F. Supp. 778, 779-81 (D. Md. 1978*)*; *Lewis v. Waletzky*, 576 F. Supp. 732, 736-387 (D. Md. 1978).

Accordingly, to the extent plaintiff seeks to present here a medical malpractice claim, it shall be dismissed, without prejudice.  *See, e.g. Octopi v. McGowan*, 294 Md. 83, 447 A.2d 860, 864-65 (Md. 1982) (holding that the condition precedent of exhaustion does not take away the subject matter jurisdiction of a state circuit court to hear and render judgments in cases involving claims that fall within the Health Care Malpractice Claims Act).[8]

March 15, 2013                              _____/s/_____
                                            Ellen Lipton Hollander
                                            United States District Judge

---

[8] A federal court may decline to exercise supplemental jurisdiction over any state law claims where it has dismissed the federal claim.  28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  When, a federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims, without prejudice, rather than retain supplemental jurisdiction.  *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).